FILED
SUPERIOR COURT
OF GUAM

2019 OCT 21 PM 1: 18

CLERK OF COURT

By:_____

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| **PEOPLE OF GUAM,** | **CRIMINAL CASE NO. CF0087-18**<br>GPD Report No. 18-04351 |
| **vs.** | |
| **ALLEN JAMES LIZAMA SIMITARA,**<br>DOB: 08/04/1988 | **DECISION AND ORDER**<br>(Motion to Suppress) |
| **DEFENDANT.** | |

### INTRODUCTION

This matter came before the Honorable Anita A. Sukola on March 17, 2019, upon Defendant's Motion to Suppress. Assistant Public Defender Theresa G. Rojas represented Allen James Lizama Simitara ("Defendant") who was present. Assistant Attorney General Matthew A. Phelps appeared on behalf of the People of Guam (the "People"). Upon review of the pleadings, oral arguments and legal authorities presented by the Parties, the Court hereby **DENIES** Defendant's Motion to Suppress.

### BACKGROUND

*A. Search Warrant* [1]

The Mandaña Drug Task Force ("MDTF") received tips from two Sources of Information ("SOI") alleging illicit drug deals occurring at a residential duplex in Talofofo.[2] *(Def. Test., May 17, 2019.)* Defendant and his wife, Doralynn Simitara ("Mrs. Simitara"), were identified as both owners

---

[1] All information in Part "A. Search Warrant" is within *Statement of Probable Cause. (Def. Ex. A at "24.")*
[2] To avoid confusion, the unidentified SOIs are herein known as "SOI-A" and "SOI-B," with female pronouns.

and dealers of the residence (the "Simitara Residence"). On or about January 12, 2018, MDTF Police Officer Peter Paulino ("Paulino") met with SOI-A. She stated that the Simitara Residence had unusually frequent vehicular traffic at all hours of the day, which increased on payday weekends. SOI-A also gave Officer Paulino a list of the visitors' license-plate numbers. GPD Records Management System revealed the visitors were individuals previously arrested for drug possession or other drug-related charges. Officer Paulino transported SOI-A to the Talofofo duplex, which she positively identified as the Simitara Residence.

SOI-A's suspicions were confirmed in a later event, occurring as follows: Talofofo resident Mike Naputi ("Naputi") asked SOI-A for a ride to the Simitara Residence. Along the ride, Naputi implied that he buys "ice" from Defendant and "couldn't wait to smoke." When pressed further, Naputi flashed a wad of cash in answer. After Naputi exited the home, he showed SOI-A his purchase, which she described as a white crystal-like substance inside cut straws.

On or about November 2017, Officer Paulino and SOI-B drove to the Talofofo duplex. There, she identified the Simitara Residence as the house where she bought "ice" from several times. On January 31, 2018, in the afternoon, Officer Paulino independently surveilled the Simitara Residence. He observed numerous vehicles coming and going– all within an hour timespan. Visitors would arrive at the residence, enter the house, then leave– the stay being no more than five minutes. Based on the information above, a search warrant was issued against the Simitara Residence on February 2, 2018.

### B. Search of Defendant

On February 9, 2018, around 6:00 P.M., a search warrant was executed upon the Simitara Residence by Guam Police Department ("GPD"), MDTF, Special Weapons and Tactics ("SWAT") and GPD K-9 Unit. *(Pl. FFCL at 2; Pl. Sureply at 2.)* MDTF was to secure the outside perimeter while SWAT entered and secured the home. *(Pl. FFCL at 2.)* SWAT officers were equipped with tactical gear, including bulletproof vests branded with "SWAT," helmets which obscured faces, and weapons such as long-arm rifles or pistols. *(Def. FFCL at ¶ 3, 7.)* Without knocking and announcing, SWAT forcibly entered the Simitara Residence, breaking in all four doors of the duplex. *Id. at ¶ 6.* Defendant recognized the intruders as SWAT. *(Def. Test., June 17, 2019.)* With

weapons drawn, SWAT yelled "Get the [expletive] down," commanding all occupants to the ground to secure the area. *(Def. FFCL at ¶ 10, 11; Pl. FFCL at 2.)* The house occupants included Defendant, Mrs. Simitara, Defendant's brother-in-law and Defendant's four children– aged sixteen, fourteen, five and four. *(Def. FFCL at ¶ 10.)* The four-year-old is afflicted with Spina Bifida; however, it is not visually apparent. *Id.* As SWAT attempted to restrain Defendant, he was allegedly yelling and struggling. *(Pl. FFCL at 2.)* However, Defendant contends he was attempting to alert SWAT of his daughter's spinal condition but was instead rebuffed. *(Def. FFCL at ¶ 25.)* Defendant was then escorted outside, purportedly still resisting. *Id.* Allegedly, Defendant ceased fighting when SWAT pushed him into the house's shutters, then onto the ground. *(Def. FFCL at ¶ 12.)*

Once SWAT secured the house, GPD and MDTF officers went inside to begin their search. *(Pl. FFCL at 2.)* Defendant and Mrs. Simitara's bedroom closet revealed one digital scale, two stainless steel scissors, eleven zip-top baggies, one heat-sealed straw and money– all within a box labeled "PIPER." *(Pl. FFCL at 2; Def. Ex. B at "11".)* A purse in the kitchen yielded a glass pipe with white residue, 0.38 gross grams of methamphetamine and $55.00 USD concealed in a tin box. *Id.* Field tests of the methamphetamine returned presumptive positive. *Id.*

Outside the house, Officer Keane Pangelinan ("Pangelinan") arrested Defendant, who purportedly agreed to speak with the officer. *(Pl. FFCL at 2.)* Defendant admitted to selling and distributing methamphetamine for approximately six months and claimed to own the discovered contraband. *Id. at 3.* In a written statement, Defendant identified several family members as his suppliers. *Id. at 3-4.* However, Defendant's statements were later recanted. *Id.* He alleged his admissions were the result of officer coercion, to wit, threatening to hold his family hostage, have his wife arrested and have his children removed from his custody. *(Def. FFCL at ¶ 52.)*

As to the warrant, Officer Paulino testified he gave Mrs. Simitara a copy of the warrant that night and informed her of the warrant's nature and purpose. *(Pl. FFCL at 2; Paulino Test., May 30.)* He maintains he served her inside the house, approximately ten minutes into the search, though she appeared to be in shock. *(Paulino Test., Mar. 30.)* On the other hand, Mrs. Simitara asserts she was never given a search warrant despite her constant demands. *(Def. FFCL at ¶ 40.)* She testified that even after requests in open court, the warrant was only provided upon discovery several months

later. *Id. at* ¶ 48.

## C. Procedural History

On January 2, 2019, Defendant filed a Motion to Suppress concerning evidence and admissions obtained during his arrest on February 9, 2018. The People filed their Opposition on January 9, 2019. Defendant's Response was filed on March 14, 2019. A Motion Hearing was held on March 15, 2019, during which a preliminary issue of burden-shifting arose. The Court ordered additional briefing on the issue and allowed the Parties to file surreplies.[3] The Court took the burden-shifting matter under advisement on March 15, 2019. A Decision and Order was issued on March 26, 2019, resolving the intervening issue. Evidentiary Hearings were held on March 17, and March 30, 2019. Final arguments were heard on June 17, 2019. The People and Defendant filed their Proposed Findings of Fact and Conclusions of Law on June 21, 2019, and July 9, 2019, respectively. The Court took the suppression matter under advisement on July 10, 2019.

## DISCUSSION

The issue before the Court is whether the execution of the search warrant was so unreasonable that suppression of the evidence is justified. Defendant argues that the fruits of the search should be suppressed because the Officers acted unreasonably when they: *(i)* failed to knock and announce, *(ii)* used excessive force and *(iii)* served the warrant belatedly. The People oppose all points and ultimately argue that suppression is improper. The Court denies suppression of the evidence for the reasons set forth below.

**I. No Fourth Amendment Violation Occurred When Exigent Circumstances Existed.**

A cornerstone of the United States Constitution is the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" *U.S. Const. Amend. IV.* This right extends to Guam via the Organic Act of Guam. *See 48 U.S.C.A. § 1421(b) (West 2017).* The Fourth Amendment relies on reasonableness. *U.S. Const. Amend. IV.* Accordingly, searches pursuant to a valid warrant are presumptively reasonable. To rebut this presumption, a defendant must prove an unreasonable Fourth Amendment violation occurred. *People v. Santos,*

---

[3] Each party filed two surreplies: the People filed two surreplies on March 18 and March 20, 2019; Defendant filed his on March 19 and March 20, 2019.

*1999 Guam 1 ¶ 51.* However, the Fourth Amendment is silent as to how a warrant must be executed. *U.S. v. Banks, 540 U.S. 31, 35 (2003).*

### A. Knock and Announce Rule Was Not Violated.

The knock and announce requirement ensures protection against unreasonable searches and seizures. *Wilson v. Arkansas, 514 U.S. 927, 931 (1995).* This requirement is reflected in common-law principles and forms part of the Fourth Amendment's reasonableness inquiry. *Id. at 934.* This reasonableness standard maintains a measure of flexibility, allowing the balance of law enforcement interests against the preservation of rights. *Id.* Accordingly, knock and announce violations are reviewed on a case-by-case basis. *Richards v. Wisconsin, 520 U.S. 385, 394 (1997).*

In the interest of law enforcement, officers maintain discretion in knocking and announcing their presence. *Richards at 394.* To dispense of the knock and announce requirement, officers must have reasonable suspicion that knocking and announcing would be dangerous, futile or inhibit the effective investigation of crime, *e.g.* the destruction of evidence. *Id.* This showing is not high; it only requires that the particular circumstances known to the officer are reasonable in totality of the circumstances. *Id. at 394-95; Banks at 36-37.*

The issue here is whether the search-team officers (the "Officers") had reasonable suspicion to forego knocking and announcing prior to entering Defendant's home. Defendant argues the Officers should have knocked and announced their presence as it is reasonable warrant procedure. However, the Court finds that exigent circumstances allowed the Officers to forego the rule.

It was reasonable for the Officers to believe that knocking and announcing their presence would pose serious safety risks to those involved. The facts support an inference that the Officers believed the Simitara Residence was potentially dangerous. Consequently, the search required particular precautions, such as raid gear, rifles and the element of surprise. This inference is supported by the Officers' available knowledge at the scene and their following actions.

It was reasonable for the Officers to believe the Simitara Residence was dangerous as three independent sources verified the information. Two SOIs reported alleged drug activity occurring at the Simitara Residence, which was verified by Officer Paulino's independent investigation. Moreover, the reports were all based on first-hand knowledge: SOI-A had contact with a buyer; SOI-

B was a buyer; and Officer Paulino conducted an on-site investigation.

An SOI's credibility is determined under the reliability factors in *United States v. Rowland.*[4] *United States v. Duenas, CR 17-00004 (D.Guam June 12, 2017) (citing United States v. Rowland, F.3d 899, 907-08 (9th Cir. 2006)).* Both SOIs are known informants as Officer Paulino personally met with them. Their bases of knowledge are through personal experiences. Lastly, the SOIs provided predictive information that was substantiated through Officer Paulino's investigations.[5] The plate numbers given by SOI-A were proven to belong to previous drug-related offenders. Officer Paulino's independent investigation yielded the same observations as SOI-A's. SOI-B, as a previous buyer, also verified SOI-A's reports. Not only were the SOIs' credibility important for obtaining the warrant, it also formed the Officers' beliefs that knocking and announcing would create dangerous conditions. *See generally U.S. v. Ramirez, 523 U.S. 65 (1998) (using a reliable informant as a factor in determining the reasonableness of a warrant's execution).*

The Officers' strategy and responding actions indicated forethought and preparation for deadly circumstances, which proves an exigent exception. Defendant suggests that the presence of more than ten Officers, including SWAT, proves excessive force. However, the number of officers also suggests preparation for unpredictable conditions, such as whom or how many individuals would be present.[6] More officers evince more control over a situation. Additionally, SWAT used tactical gear, like bulletproof vests, helmets and weapons like long-arm rifles and pistols, to execute the warrant. The time of procurement is important here. Because SWAT obtained the tactical gear and rifles beforehand, it suggests the Officers anticipated a highly dangerous situation. This is further supported by the Officers' conduct before and during the safety sweep of the house. The Officers' prior strategizing closed any gaps left by incomplete or unknown information.

The Officers' strategy illustrates that incomplete data on Defendant was remedied by over-preparedness, *e.g.* the number of officers present, the gear used and the strategy in entering the house. It was reasonable to believe multiple people could be inside the house due to its size as a

---

[4] Reliability is assessed under five factors. Two factors not discussed are: a record of reliability and motive. *Duenas at 4.*
[5] Predictive information is the intimate details of a matter unknown to the public.
[6] Shortly before the warrant execution, some officers allegedly saw a person resembling "Brandon Elms" with Defendant or at Defendant's residence. This is an example of a situation the Officers may have anticipated when strategizing.

duplex and the numerous people frequenting the house at all hours of the day. *See U.S. v. Ankeny, 502 F.3d 829, 836 (2007) (noting that multiple individuals inside a house was a legitimate safety concern).* It is evident the Officers were unsure of who was inside the house. The searched happened at 6:00 P.M.– a time people are normally awake. Officer Paulino's investigation revealed the frequent visitors were previous arrestees.[7] The Officers also did not know Defendant's house layout. The neighbor states that all four doors of the duplex were broken in: two on Defendant's side and two on the empty side. The Officers likely would not have broken down the door if they knew no one was inside. Considering the facts above, it was reasonable for the Officers to assume the house may contain dangerous individuals.

Surprise was also an integral strategic element as the Officers were acting on incomplete knowledge. *Ankeny at 836 (using the element of surprise and a house's design in a reasonableness inquiry).*[8] Defendant easily recognized SWAT, stating he believed they were SWAT upon their entrance. Their gear was also branded with "SWAT." Because they were easily identifiable, surprise allowed the Officers to maintain a measure of safety. *Cf. Banks at 39 (holding that knocking and announcing was futile as the defendant quickly recognized the officers).* Even if Defendant argues that none their information was true, reasonableness is viewed through the eyes of an officer. *Id. at 39; Ramirez at 71-72.* Relevance only matters concerning the facts known to an officer at the time of exigency, not the truth.[9] *Banks at 40.* Here, the Officers had exigent circumstances to forego knocking and announcing; thus, suppression cannot be granted on this ground.

**B. Officers Did Not Use Excessive Force.**

The touchstone of reasonableness governs the execution of a warrant. *Banks at 35-36.* Therefore, an otherwise lawful entry may be invalidated due to unreasonableness. *Ankeny at 836; cf. Ramirez at 70-71.* To determine the use of excessive force, "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without

---

[7] Nevertheless, drug offenses are not indicative of a dangerous individual. *See Richards at 396 (rejecting a blanket exception for searches involving drugs due to its alleged dangerous nature).*

[8] In *Ankeny*, one safety concern was the difficulty in securing the house due to its design. This, along with other factors, led officers to believe that distraction through surprise was necessary to ensure a safer entry. *Ankeny at 836.*

[9] This standard is based on the fact that officers are often forced to make split second decisions in high tension situations. *Graham at 396-97.* Decisions are also made during circumstances that are often changing and have an impact on the officer's safety. *Id.*

regard to their underlying intent or motivation." *Graham v. Connor, 490 U.S. 386, 397 (1989)* *(internal quotations omitted)*. Reasonableness is determined though an officer's perspective while on the scene, taken in totality of the circumstances. *Id. at 396.*

The Officers did not use excessive force against the Simitara family. As previously mentioned, the Officers had a valid concern for their safety. Framed in this manner, the Officers' manner and conduct were in response to perceived danger. Even if the Simitara family posed no real danger, reasonableness is based on an officer's knowledge at the scene; it is not based on facts. *Graham at 396-97 (stating "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation).*

It was reasonable for SWAT to only focus on securing the occupants– instead of Defendant's words– as safety was their primary task. The force used was relative to Defendant's resistance. To an officer, Defendant's active resistance could be perceived as dangerous. *Graham at 396 (stating actively resisting arrest or attempting to evade arrest are factors in determining excessive force).* Defendant maintains he only attempted to alert the Officers of his daughter's condition. However, this does not consider the hectic environment of the search. The incident was loud enough to be heard from across the street. There was a constant influx of people as the Simitaras, GPD, MDTF, SWAT and the K-9 Unit were all on the scene. Mrs. Simitara also stated, "Everything happened so fast. I was shocked." *(Mrs. Simitara Test., May 30.)* With the flurry of events, it is reasonable that voices could easily be drowned out.

Defendant pointedly argues it was excessive that his youngest daughter was forced onto the ground despite her spinal condition. However, a look at Defendant's daughter would not inform SWAT of her spinal condition; Defendant states her condition is not visually apparent. SWAT's force was not excessive; it was responsive to the observed level of threat. *Graham at 396 (stating whether a suspect poses an immediate threat to safety of the officers or others is a factor in analyzing excessive force).* Therefore, commanding the daughter to the ground was not excessive force. Lastly, the strip search of Mrs. Simitara was not excessive force. Mrs. Simitara was also a

subject of the search warrant. However, unlike Defendant, Mrs. Simitara did not necessitate an arrest. Yet, to reach this conclusion, she would have to be investigated, *i.e.* searched. Given the available knowledge at the time, SWAT's conduct was not excessive force. The warrant was not rendered unreasonable; thus, suppression cannot be granted on this ground.

## II. Suppression Inapplicable In Cases of Insufficient Cause.

Whether a Fourth Amendment violation occurred is a separate issue from the applicability of the exclusionary rule. *Hudson v. Michigan, 547 U.S. 586, 591-92 (2006).* Evidence becomes "fruit of the poisonous tree" when obtained through unlawful searches or seizures. *U.S. v. Crawford, 372 F.3d 1048, 1054 (9th Cir. 2004).* The exclusionary rule remedies that violation by suppressing those fruits. [10] *Hudson at 593.* However, not every but-for violation mandates the exclusionary sanction. *Id. at 586.* The rule is judiciously applied as social costs suffer greatly at the hands of suppression. *Id. at 591.*

The exclusionary rule applies when a causal link exists between the evidence seized and the alleged right violated.[11] *Crawford at 1054.* Causation is proven by the preponderance of the evidence on a case-by-case basis. *United States v. Andrade, 784 F.2d 1431, 1433 (9th Cir. 1986) (citations omitted); Crawford at 1054 (stating the ". . . application of the exclusionary rule depends largely on the facts of each case,") (citations omitted).*

### A. No Causation Between the Evidence and Violation.

There is no causal link between the evidence Defendant seeks to suppression and the right allegedly violated. The drugs and the drug paraphernalia were found inside a purse and inside the bedroom closet. Furthermore, Defendant's admissions were obtained subsequent to his valid arrest. No facts suggest the Officers would *not* have discovered the evidence had they initially knocked and announced. The evidence was not expertly hidden in a location that the Officers would not have eventually searched. Regardless of excessive force, suppression is still not appropriate as nothing

---

[10] Knock and announce violations do not warrant evidence suppression. *Hudson at 599.* The exclusionary rule only vindicates the right that was violated, hence, only the evidence from that particular violation is suppressible. *Id. at 591.* The interests protected by the knock and announce principle are distinct from the exclusionary rules' interests. *Id. at 593-94.* Thus, the Supreme Court has held that massive, remedial suppression is unjustified. *Id. at 599.*

[11] "[F]or general objections to the manner of executing a search, suppression requires a causal link between those complained-of-behaviors and the seizure of the evidence[.]" *U.S. v. Ankeny, 502 F.3d 829, 835 (9th Cir. 2007).*

changes the fact that the Officers still would have found the evidence. *Ankeny at 834-35.*

In essence, knocking and announcing had no effect on the evidence the Officers obtained. *People v. Villacrusis, No. CRIM. 91-00089A, 1992 WL 97217, at 3 (D.Guam App. Div., Apr. 16, 1992), aff'd sub nom. People v. Villacrusis, 992 F.2d 886 (9th Cir. 1993) (stating that a search's validity is irrelevant when the contraband would be inevitably discovered. See Hudson at 596 (stating "ignoring knock-and-announce can realistically be expected to achieve absolutely nothing except the prevention of destruction of evidence and the avoidance of life-threatening resistance by occupants of the premises– dangers which . . . suspend the knock-and-announce requirement anyway.")* The exclusionary rule is limited to specific evidence gained through the particular unreasonable search or seizure. *Hudson at 590.* This circumstance is not present here. No causal link exists that justifies using the exclusionary rule; therefore, suppression cannot be granted on this ground.[12]

### III. Suppression Inapplicable for Noncompliance of Warrant Statute.

Defendant argues that the Officers violated his fundamental right by belatedly serving the warrant– a right that is protected under *8 Guam Code Ann. § 35.35 (2018).*[13] Automatic suppression is not mandatory for all warrant defects under Rule 41. *U.S. v. Vasser, 648 F.2d 507, 510 (1980).* Instead, suppression is only required for fundamental violations of Rule 41. *Id.* Non-fundamental violations do *not* require suppression *unless* there is prejudice. *Id.* A defendant is prejudiced if "the search might not have occurred or would not have been so abrasive if the Rule had been followed, or . . . there is evidence of intentional and deliberate disregard of a provision in the Rule." *Id. (internal quotations and citations omitted).*

The Parties dispute the date the warrant was provided. Officer Paulino states he personally served Mrs. Simitara the night of the search. *(Paulino Test., May 30.)* Defendant states they received the warrant four months after his arrest. *(Rojas Test., July 17.)* Even if Defendant was first served

---

[12] "Whether that preliminary misstep had occurred or not, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house. But even if the illegal entry here could be characterized as a but-for cause of discovering what was inside, we have never held that evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police." *Hudson at 592 (internal quotations omitted).*

[13] Guam Code Annotated "GCA" states Section 35.35 and Fed. R. Crim. P. 41(d) [now 41(f)] (2019) are similar.

four months later, he fails to establish a fundamental right or prejudice. Contrary to Defendant's arguments, the Fourth Amendment does not require service at the outset in order to trigger a search. *State v. Wraspir, 20 Wash. App. 626, 628 (1978).* Immediate service of a warrant is not a constitutional right. *Id. See generally State v. Aase, 121 Wash. App. 558 (2004) (holding that serving a warrant several minutes into a search was not an unreasonable);*

Defendant fails to prove how a four month delay amounts to a fundamental violation. *State v. Kern, 81 Wash. App. 308, 317-18 (1996); United States v. Johns, 948 F.2d 599, 603-04 (9th Cir. 1991), cert denied, 505 U.S. 1226, 112 S.Ct. 3046, (1992).* Procedural non-compliance will not invalidate an otherwise valid search warrant or compel evidence suppression. *State v. Linder, 190 Wash. App. 638 ¶ 1 (2015) (citations omitted). See People v. Head, 30 Cal. App. 4th 954, 960 (1994) (holding a one year delay did not require suppression when delay was negligent rather than willful or prejudicial).*

Suppression is reserved for violations arising from the Fourth Amendment. *Crawford at 1054.* It is applied when no remedy is available. *Cf. Linder at ¶ 2, 27-31 (stating when no other cure exists, then suppression is considered).* Here, the violation was cured when the Government provided the warrant. Evidently, Defendant did have a remedy. *See Linder at ¶ 28; cf. Taisipic v. Marion, 1996 Guam 9 ¶ 37-39 (holding that non-compliance due to a parole hearing delay does not justify relief when the defendant was eventually heard); cf. Jones v. U.S. Bureau of Prisons, 903 F.2d 1178, 1179 (8th Cir. 1990) (holding that a parole hearing delay of six years against federal law did not entitle relief because the defendant eventually received a hearing), quoted in Taisipic at ¶ 39.*

The matter here is distinguishable from *Linder.* The court in *Linder* held evidence was suppressible when the officer violated a statutory warrant requirement. An officer, acting alone, seized illicit drugs from the defendant's home. The defendant sought suppression pursuant to a local statute requiring an officer to inventory evidence in the presence of another. The court found suppression to be proper when the evidence was a fruit of the violation and the violation could not be

cured by other means.[14] Here, Defendant argues that suppression is justified since the warrant was served untimely. Yet, unlike *Linder*, the evidence here does not arise from the violation, *i.e.* delayed service. The Officers still would have discovered the evidence regardless of the time of service. *See generally Ankeny, 502 F.3d 829*. Absent a showing of unreasonable delay and prejudice, Defendant is not entitled to suppression. *Wraspir at 630*.

Defendant fails to establish that the search was unreasonable and so the warrant remains valid as to its issue and execution. Because Defendant fails to prove a Fourth Amendment violation on all grounds, suppression of the evidence is denied.

<u>CONCLUSION</u>

Based on the preponderance of the evidence and the foregoing conclusions, the Court hereby **DENIES** Defendant's Motion to Suppress.

A **Criminal Trial Setting** is set for _____ Nov. 12, 2019 _____ at _____ 10 a.m. _____

SO ORDERED ___ 10/21/19 ___.

_____
**The Honorable Anita A. Sukola**
Judge, Superior Court of Guam

SERVICE VIA COURT BOX
I acknowledge that a copy of the original hereto was placed in the court box of PDSC
Date: 10-21-19  Time: 1:25 p
Deputy Clerk, Superior Court of Guam

---

[14] Suppression could not cure the violation as the defendant's trial had already concluded.